# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2018-0671-JTL |
| MARK ZUCKERBERG, MARC ANDREESSEN, PETER THIEL, REED HASTINGS, ERSKINE B. BOWLES, and SUSAN D. DESMOND-HELLMANN, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| FACEBOOK, INC., | ) ) | |
| Nominal Defendant. | ) | |

## OPINION

Date Submitted: July 29, 2020
Date Decided: October 26, 2020

P. Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; Robert C. Schubert, SCHUBERT JONCKHEER & KOLBE LLP, San Francisco, California; James E. Miller, SHEPHERD FINKELMAN MILLER & SHAH, LLP, Chester, Connecticut; *Attorneys for Plaintiff.*

Kevin R. Shannon, Berton W. Ashman, Jr., Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William Savitt, Ryan A. McLeod, Anitha Reddy, Cecilia A. Glass, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Defendants Marc L. Andreessen, Erskine B. Bowles, Susan D. Desmond-Hellmann, Reed Hastings, and Peter A. Thiel.*

Raymond J. DiCamillo, Kevin M. Gallagher, Megan E. O'Connor, RICHARDS, LAYTON & FINGER, P.A, Wilmington, Delaware; George M. Garvey, Laura Lin, MUNGER, TOLLES & OLSON LLP, Los Angeles, California; *Attorneys for Defendant Mark Zuckerberg.*

David E. Ross, Garrett B. Moritz, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; George M. Garvey, Laura Lin, MUNGER, TOLLES & OLSON LLP, Los Angeles, California; *Attorneys for Nominal Defendant Facebook, Inc.*

**LASTER, V.C.**

Defendant Mark Zuckerberg is the founder, CEO, chairman of the board, and controlling stockholder of nominal defendant Facebook, Inc. At Zuckerberg's request, the Facebook board of directors (the "Board") pursued a reclassification of Facebook's shares. The transaction involved authorizing a new class of non-voting stock, then issuing two shares of non-voting stock to each existing stockholder. The effect of the reclassification would be to shift two-thirds of Facebook's economic value into the non-voting stock. The chief beneficiary was Zuckerberg, who would be able to transfer the bulk of his economic ownership in Facebook without giving up voting control.

Various stockholder plaintiffs filed lawsuits and sought a permanent injunction blocking the reclassification. Facebook agreed not to implement the reclassification until after a ruling on its merits. Just before trial, at Zuckerberg's request, the Board withdrew the reclassification. That decision gave the plaintiffs everything they sought to achieve, rendering that litigation moot.

The plaintiff in this litigation filed a derivative action against Zuckerberg and certain members of the Board who approved the reclassification. The plaintiff maintains that the pursuit of the reclassification constituted a breach of duty and that Facebook was harmed as a result. As damages, the plaintiff seeks to recover $21.8 million that Facebook expended pursuing the reclassification and defending the transaction until the eve of trial, plus $68.7 million that Facebook paid the prior plaintiffs as a fee award. The plaintiff alleges that Facebook has suffered other damages, including reputational harm, in an amount to be proven at trial.

The defendants moved to dismiss this derivative action under Rule 23.1 on the grounds that the plaintiff failed to demand that the Board pursue the litigation and did not establish that demand was futile. This decision grants the defendants' motion.

## I.    FACTUAL BACKGROUND

The facts are drawn from the amended complaint and the documents that it incorporates by reference. At this stage of the proceeding, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

### A.    Facebook

Facebook is a publicly traded Delaware corporation with its principal place of business in Menlo Park, California. Facebook is a social networking platform that allows users to create profiles, upload photos and videos, send messages, and communicate with friends, family, and colleagues. Based on global reach and total active users, Facebook is the largest social media and networking service. As of December 31, 2018, Facebook had 2.32 billion monthly users.

Facebook is one of the ten largest companies in the world by market capitalization. Shares of Facebook's Class A common stock trade on the Nasdaq under the symbol "FB." Facebook is a "controlled company" under applicable Nasdaq rules. Compl. ¶ 11. Zuckerberg controls Facebook, having founded the company in 2004 and served as its CEO and as a director since then. Since 2012, Zuckerberg has served as chair of the Board.

When the events giving rise to this litigation began, Zuckerberg beneficially owned shares that carried 53.8% of Facebook's outstanding voting power, but which reflected economic ownership of only 14.8%. Zuckerberg exercised disproportionate voting power

2

because of Facebook's dual-class capital structure. Facebook's certificate of incorporation authorized two classes of common stock: (i) Class A common stock, which carried one vote per share, and (ii) Class B common stock, which carried ten votes per share. Zuckerberg owned around 4 million Class A shares and 419 million Class B shares. His Class B shares carried as much voting power as 4.19 billion Class A shares.

## B. Zuckerberg Takes The Giving Pledge.

In December 2010, Zuckerberg took the Giving Pledge. Championed by Bill Gates and Warren Buffett, the Giving Pledge calls on wealthy business leaders to donate a majority of their wealth to philanthropic causes. Zuckerberg announced that he would begin his philanthropy early in life.

In March 2015, Zuckerberg developed a plan to complete the Giving Pledge by making annual donations of shares of Facebook stock worth $2–3 billion, eventually giving away 99% of his wealth. At some point, donations of this magnitude would cause Zuckerberg to lose control over Facebook.

Zuckerberg asked Facebook's general counsel to examine how soon the donations would undermine his voting control. The answer was quite soon. Zuckerberg only could donate shares worth approximately $3–4 billion before losing voting control.

To avoid this result, Facebook's general counsel recommended that Zuckerberg follow the "Google playbook." Facebook would authorize new shares of Class C common stock that would not have any voting rights, then distribute shares of Class C common stock to all its existing stockholders, including Zuckerberg. By doing so, Facebook would reallocate a portion of its economic value to the new non-voting shares. No existing

3

stockholders would be harmed because each stockholder would receive a proportionate number of Class C shares. For Zuckerberg, however, the reallocation of a portion of his economic ownership to the non-voting Class C shares would allow him to transfer that portion without undermining his voting control.

Facebook's general counsel advised Zuckerberg that the reclassification required (i) an amendment to Facebook's certificate of incorporation, followed by (ii) a dividend of Class C shares. Both required Board approval, and the amendment required stockholder approval. Given the voting power of his holdings, Zuckerberg could approve the amendment at the stockholder level, so the only hurdle was Board approval. Facebook's general counsel recommended that the Board form a special committee to evaluate the transaction. Facebook's general counsel also advised that Google's reclassification led to stockholder litigation, which ended with a settlement valued at $522 million.

Zuckerberg liked the idea of a reclassification. He told Facebook's legal team to "start figuring out how to make this happen." *Id.* ¶ 22.

## C. Zuckerberg Proposes The Reclassification.

In June 2015, Zuckerberg told the Board about the Giving Pledge and his plan to donate his Facebook shares. He explained that he wanted to consider the implications of reducing his stock ownership and how best to position Facebook moving forward.

Zuckerberg retained Simpson Thacher & Bartlett LLP and Goldman, Sachs & Co. to advise him on the reclassification. On August 20, 2015, Zuckerberg formally proposed to the Board that Facebook engage in a reclassification.

4

On August 22, 2015, the Board established a special committee to review, analyze, and negotiate the reclassification (the "Committee"). The Board also tasked the Committee with evaluating potential alternatives to a reclassification and making a formal recommendation to the Board. The members of the Committee were defendants Marc Andreessen, Erskine Bowles, and Susan Desmond-Hellmann.

The Board authorized the Committee to retain its own legal and financial advisors. At the recommendation of Facebook management, the Committee selected Wachtell, Lipton, Rosen & Katz LLP as its legal advisor. The Committee did not meet with Wachtell before hiring the firm. The Committee was supposed to prepare a formal charter delineating its duties and responsibilities, but it never did.

## D.    The Committee Negotiates With Zuckerberg.

Before meeting with the Committee, Wachtell contacted Simpson Thacher to discuss the terms of a reclassification. Simpson Thacher rejected as "non-starters" certain corporate governance concessions from the "Google playbook," including (i) a "stapling" provision that would have required Zuckerberg to sell a share of high-vote Class B stock each time he sold a share of non-voting Class C stock and (ii) a "true-up" payment to the Class A stockholders to compensate them for the dilution of their voting power. *See id.* ¶ 33.

On September 23, 2015, Wachtell met with the Committee for the first time. From the outset, the Committee anticipated that a reclassification would take place. Its deliberations focused less on whether to pursue a reclassification or propose an alternative and more on the details of the reclassification that Zuckerberg wanted.

On October 12, 2015, the Committee retained Evercore Partners as its financial advisor. As with Wachtell, the Committee did not meet with Evercore before retaining the firm. The lead banker from Evercore noted that they were hired "in the second inning," after the transaction was well underway. *Id*. ¶ 34 (internal quotation marks omitted).

At some point, Facebook retained Morgan Stanley & Co. LLC as its financial advisor. Simpson Thacher had previously spoken with Morgan Stanley about serving as Zuckerberg's personal financial advisor, and Morgan Stanley briefly acted in that role before Zuckerberg retained Goldman Sachs. As a result, Morgan Stanley knew about Zuckerberg's expectations for the reclassification, and Morgan Stanley used Simpson Thacher's work product when preparing its analyses of the reclassification.

On October 23, 2015, at the Committee's request, Wachtell spoke with Simpson Thacher about eight "Possible Concessions" from Zuckerberg:

- sunset provisions,

- an equal treatment provision,

- a non-competition covenant,

- acquisition protections,

- an independent nominating committee,

- conditioning the reclassification on the approval of Facebook's Class A stockholders,

- "stapling" provisions or other transfer restrictions, and

- a "true-up" payment to the Class A stockholders.

Wachtell already knew from its earlier communications with Simpson Thacher that Zuckerberg would not agree to the last two proposals. Zuckerberg now rejected the idea of a Class A vote. Zuckerberg agreed to consider the first five concessions.

On November 9, 2015, the Committee discussed the five concessions that Zuckerberg had agreed to consider. The Committee did not ask about the concessions that Zuckerberg had rejected; it simply accepted Zuckerberg's position. Evercore advised the Committee that Facebook's Class A stockholders were unlikely to approve the reclassification. Evercore did not provide any explanation, and the Committee did not ask why or otherwise explore the comment.

Although negotiations ostensibly had just begun, Zuckerberg was confident that the Board would approve a reclassification. He told Facebook's COO, Sheryl Sandberg, that there were "lots of details to work through, but at this point we're much more in the mode of making decisions and locking things down rather than broad consideration." *Id.* ¶ 39 (internal quotation marks omitted). On November 9, 2015, Zuckerberg publicly reaffirmed his Giving Pledge, noting that his "giving [was] just starting" and that he and his spouse planned to "expand" their giving. *Id.* ¶ 40 (internal quotation marks omitted).

The next day, Zuckerberg circulated a draft announcement that described his "new model of philanthropy" and involved donating 99% of his wealth during his lifetime. *Id.* He solicited comments from various Facebook personnel, including Desmond-Hellmann, one of the three members of the Committee. Zuckerberg told the other two members of Committee—Andreessen and Bowles—about his plan before he announced it. Both Andreessen and Bowles reacted enthusiastically. Andreessen told Zuckerberg that he was

7

"very proud" of him, and Bowles told Zuckerberg that he was "proud to be a small part of your life." *Id.* Zuckerberg also told Warren Buffett and Bill and Melinda Gates about his plan. Melinda Gates forwarded her email conversation with Zuckerberg to Desmond-Hellmann, along with a smiley emoji. Zuckerberg later told the Board that he planned to announce that he and his spouse had committed "to give 99% of [their] FB shares during [their] lives with a focus on improving the world for the next generation." *Id.*

On November 11, 2015, Wachtell relayed the Committee's demands to Simpson Thacher. The demands largely hewed to the five concessions that Zuckerberg had agreed to consider. The Committee did not attempt to extract a cash payment or a greater number of Class C shares for the Class A stockholders. The Committee did not propose that the reclassification be conditioned on Class A stockholder approval. The Committee also did not ask for any type of restriction on Zuckerberg's ability to sell stock.

On December 1, 2015, Zuckerberg announced his Giving Pledge through a Facebook post. He simultaneously affirmed that he would "remain[] Facebook's CEO for many, many years to come." *Id.* ¶ 41 (internal quotation marks omitted). To do both, Zuckerberg needed the reclassification to become a reality. The announcement did not mention the reclassification, the Committee, or the need for the Committee and the Board to approve the reclassification. Zuckerberg did not seek Board approval before posting his announcement.

Over the next week, Zuckerberg's pledge received negative press. On December 6, 2015, Zuckerberg emailed Andreessen, writing, "This has been a crazy week. I want to

8

thank you for all your support, and all you're doing to defend and spread what we're actually doing." *Id.* ¶ 43.

By January 27, 2016, the Committee largely had agreed to move forward with a reclassification. Over the next three months, the Committee and Zuckerberg negotiated various corporate governance provisions, focusing primarily on sunset provisions. The final slate of governance provisions permitted Zuckerberg to retain voting control of Facebook, even if he took years off to work for the government or redirected his focus to managing the charity that he and his wife had created.

## E.     Andreessen Back-Channels Information To Zuckerberg.

Throughout the negotiations over the reclassification, Andreessen regularly engaged in back-channel communications with Zuckerberg about what the Committee was doing. Andreessen and Zuckerberg exchanged text messages in which Andreessen described at least twelve different meetings during which the Committee deliberated over its negotiating positions. Andreessen shared with Zuckerberg details about what the Committee focused on, what questions the members would ask, and how each member felt about different governance issues. *Id.* ¶ 47.

For example, on February 11, 2016, the Board met to receive an update on the Committee's progress. An hour before the meeting, Andreessen sent a series of text messages to Zuckerberg. He told Zuckerberg, "Between us – re special board session. 1 new share class will happen. 2 everyone loves [your plan]." *Id.* ¶ 48 (internal quotation marks omitted). He added that the Committee "love[d] the intent." *Id.* He texted that the Committee was merely working "around the edges of the big things you want." *Id.* He told

9

Zuckerberg that the Committee was working to "protect the company and you personally." *Id.* Later that day, Andreessen reassured Zuckerberg that "[a]ll [of the Committee's] feedback is to protect you and the company." *Id.* At other points, Andreessen acknowledged to Zuckerberg that several Facebook "senior staff think[] this is a big mistake" and that they "wish you would stop but don't want to challenge you." *Id.*

In addition to back-channeling information, Andreessen coached Zuckerberg before, during, and after calls with the Committee. For example, during a teleconference with the Committee on March 5, 2016, when Zuckerberg was pushing for the right to take an eight-year leave of absence, Andreessen coached Zuckerberg through the negotiations via text message. Throughout the meeting, Andreessen shared live updates with Zuckerberg. He told Zuckerberg when his arguments were falling flat: "This line of argument is not helping ☺." *Id.* ¶ 49 (internal quotation marks omitted). He told Zuckerberg when to back off: "The committee wants to do this. You don't need to question that." *Id.* And he encouraged Zuckerberg when his arguments were working: "NOW WE'RE COOKING WITH GAS." *Id.*

In another example, Zuckerberg was scheduled to talk to Desmond-Hellmann on March 11, 2016. The day before, Zuckerberg asked Andreessen, "Do you have any context before I talk to Sue tomorrow." *Id.* ¶ 47 (internal quotation marks omitted). Andreessen provided a detailed preview of the call.

These communications are only examples. Andreessen engaged in similar communications with Zuckerberg throughout the negotiations.

**F. Facebook Moves Forward With The Reclassification.**

On April 5, 2016, the Committee met to discuss the reclassification. Zuckerberg and an outside director, defendant Peter Thiel, attended. On April 13, 2016, the Committee voted to recommend the reclassification to the full Board.

Under the terms of the reclassification, Facebook would amend its charter to authorize the new Class C stock and to add certain corporate governance provisions. Facebook then would declare a dividend of two Class C shares of Facebook stock for each existing share of Class A and Class B stock. And Zuckerberg would enter into a "Founder Agreement" with Facebook conditioned on the reclassification becoming effective. *See id.* ¶ 56 (the "Reclassification").

Under the Founder Agreement, Zuckerberg agreed that if he ever owned less than 50.1% of the outstanding Class B shares, then he would retire Facebook's multi-class structure. Zuckerberg's also agreed that his high-vote shares would lose their additional voting rights if he left Facebook. But Zuckerberg could satisfy the condition that he remain at Facebook by serving as an "Approved Executive Officer," which only required that he serve as a vice president in charge of a principal business unit, division, or function. With the approval of the independent directors, that position could be part-time. The Founder Agreement permitted Zuckerberg to take a leave of absence to pursue government service and continue to maintain his voting control, as long as he retained at least 30% of the shares that he held on the effective date of the Reclassification.

Bowles was concerned about the government-service provision. In one of his back-channel text messages, Andreessen told Zuckerberg that Bowles regarded the provision as

11

"an unforced error," which he "may grudgingly support [] at the end." *Id.* ¶ 58 (internal quotation marks omitted). Andreessen also told Zuckerberg that Bowles was "worried" that the government-service provision would be "the straw that breaks the camel's back on the optics of good governance" and "the thing people will point to on announcement and say 'what the f*ck are you guys doing agreeing to this.'" *Id.*

On April 14, 2016, the Board approved the Reclassification. Zuckerberg, Sandberg, and then-director Jan Koum abstained from the vote. *Id.*

## G.  Facebook Stockholders Challenge The Reclassification.

Facebook did not immediately announce the Reclassification. Facebook delayed the announcement until April 27, 2016, when Facebook publicly announced both the Reclassification and its best-ever quarterly earnings. An Evercore banker told Desmond-Hellmann, "Anytime FB announces earnings like that, no one will care about an equity recapitalization." *Id.* ¶ 59 (internal quotation marks omitted).

On April 29, 2016, Facebook stockholders filed a lawsuit in this court challenging the Reclassification. In subsequent days, another twelve cases were filed. The thirteen cases were consolidated. *See In re Facebook, Inc. Class C Reclassification Litig.*, C.A. No. 12286-VCL (the "Reclassification Action").

On June 20, 2016, Facebook held its annual stockholders meeting. Shares carrying 5.1 billion votes were voted in favor of the Reclassification, while shares carrying 1.5 billion votes were voted against. The shares voted in favor included Zuckerberg's holdings of 4 million Class A shares and 419 million Class B shares, which together constituted 4.7 billion votes. Excluding Zuckerberg's votes, the tally would have been around 453 million

12

shares in favor and 1.5 billion shares against. Put differently, holders of more than 70% of the disinterested shares opposed the Reclassification.

The plaintiffs in the Reclassification Action sought injunctive relief blocking the consummation of the transaction. On June 24, 2016, the parties to the Reclassification Action agreed that Facebook would not implement the Reclassification while litigation was ongoing. On April 17, 2017, this court certified a class of stockholders comprising the holders of Facebook common stock other than Zuckerberg. Trial was scheduled to begin on September 26, 2017.

## H.    Facebook Abandons The Reclassification.

On September 21, 2017, five days before trial was set to begin, Zuckerberg asked the Board to abandon the Reclassification. The Board agreed, and the next day, Facebook issued a Form 8-K announcing the Board's decision. Facebook also announced that Zuckerberg still planned to fulfill the Giving Pledge by selling or donating between 35 and 75 million shares over the next eighteen months. Zuckerberg posted on Facebook about the abandoned Reclassification, explaining that he "knew it was going to be complicated and it wasn't a perfect solution." Compl. ¶ 62 (internal quotation marks omitted). He stated that he had come up with a "better" plan that would allow him to "fully fund" his philanthropy and "retain voting control of Facebook for 20 years or more." *Id.* Zuckerberg made clear that although Facebook had abandoned the Reclassification, he and his spouse still planned "to give away 99% of [their] Facebook shares during [their] lives." *Id.* He claimed that they "now plan[ned] to accelerate [their] work and sell more of those shares sooner." *Id.* Over

the next sixteen months, Zuckerberg sold about 30.4 million shares for around $5.6 billion without losing control of Facebook. *See id.*

Because the plaintiffs in the Reclassification Action sought to block its implementation, the Board's withdrawal of the Reclassification gave them everything they wanted and rendered the Reclassification Action moot. By the time that the Board made its decision, Facebook had incurred approximately $21.8 million to pursue the Reclassification and defend the Reclassification Action. Then, as compensation for the benefits conferred by the Reclassification Action, Facebook agreed to pay a fee award of $68.7 million to plaintiffs' counsel.

## I.    This Litigation

On September 12, 2018, the plaintiff filed this derivative action. The complaint asserts a single count for breach of fiduciary duty. According to the complaint, the defendants "violated their fiduciary duties of care and loyalty" by pursuing and approving the Reclassification. *Id.* ¶ 110. The plaintiff further contends that the defendants "breached their fiduciary duties by failing to adequately evaluate Andreessen and Desmond-Hellmann's suitability to serve on the [Committee] . . . and then appointing these individuals to the [Committee]." *Id.* According to the complaint, Facebook is entitled to recover damages from the defendants for the "massive expenditures on financial advisors, experts, and attorneys retained by [Facebook] in connection with the Reclassification . . . , exposure to the Reclassification [Action] and the related litigation costs, and damage to Facebook's reputation and goodwill." *Id.* ¶ 111.

## II.    LEGAL ANALYSIS

When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved. *See* 8 *Del. C.* § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).[1] "Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (footnote omitted). Section 141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets. *See id.*

---

[1] In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent that they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits their cumbersome subsequent history.

In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim. *Aronson*, 473 A.2d at 811. Unless the board of directors permits the stockholder to proceed, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation. *Ainscow v. Sanitary Co. of Am.*, 180 A. 614, 615 (Del. Ch. 1935) (Wolcott, C.) (citing *Sohland v. Baker*, 141 A. 277 (Del. 1927)).

The doctrines of demand refusal and demand excusal are substantive requirements of Delaware law. As a matter of procedure, Rule 23.1 imposes a pleading requirement on a plaintiff that seeks to assert a derivative claim so that the doctrines can be applied at the pleading stage. Rule 23.1 did not create the demand requirement; it is merely the "procedural embodiment of this substantive principle." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993); *accord Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96–97 (1991) (holding that the demand requirement underlying Rule 23.1 is substantive, and the Rule 23.1 pleading requirement is procedural).

Rule 23.1 requires that when a stockholder seeks to assert a derivative claim, the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Ct. Ch. R. 23.1(a). For a pleading to satisfy Rule 23.1, the plaintiff "must comply with stringent requirements of factual particularity that differ substantially from . . . permissive notice

16

pleadings . . . ." *Brehm*, 746 A.2d at 254. Under the heightened pleading requirements of Rule 23.1, "conclusionary [sic] allegations of fact or law not supported by the allegations of specific fact may not be taken as true." *Grobow*, 539 A.2d at 187.

The requirement of factual particularity does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations. "The well-pleaded factual allegations of the derivative complaint are accepted as true on such a motion." *Rales*, 634 A.2d at 931. "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged . . . ." *Brehm*, 746 A.2d at 255. Rule 23.1 requires that a plaintiff allege specific facts, but "he need not plead evidence." *Aronson*, 473 A.2d at 816; *accord Brehm*, 746 A.2d at 254 ("[T]he pleader is not required to plead evidence . . . .").

The plaintiff in this case chose not to make a pre-suit demand. The operative question is therefore whether "demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation." *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006). Subject to exceptions not applicable here, the demand futility analysis asks whether the board of directors as constituted when the lawsuit was filed could exercise disinterested and independent judgment regarding a demand. *See In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007). When determining whether the particularized allegations of the complaint support a reasonable inference that a director could not meet this standard, the court must consider the plaintiff's allegations "in their totality and not in isolation from each other." *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015). The question is whether the constellation of allegations, viewed holistically, creates a reasonable doubt about the director's ability to

17

consider a demand objectively. *See In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018).

To determine whether a board of directors could properly consider a demand, a court counts heads. *See In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016). If the board lacks a majority of directors who could exercise independent and disinterested judgment regarding a demand, then demand is futile.[2]

## A.    The Standards For Evaluating Whether Directors Can Consider A Demand

The Delaware Supreme Court has established two tests for determining whether directors can exercise independent and disinterested judgment regarding a demand. *See Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). The *Aronson* decision announced the first test. The *Rales* decision announced the second test. Both tests remain authoritative, but the *Aronson* test has proved to be comparatively narrow and inflexible in its application, and its formulation has not fared well in the face of subsequent judicial developments. The

---

[2] *Aronson*, 473 A.2d at 812 (noting that if a board decision is "not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application"); *see Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004) (noting that for demand futility purposes, a disinterested and independent majority is required, such that a board evenly divided between interested and disinterested directors could not exercise business judgment on a demand); *Beneville v. York*, 769 A.2d 80, 85–87 (Del. Ch. 2000) (holding that demand is futile if the board is split); *Gentile v. Rossette*, 2010 WL 2171613, at *7 n.36 (Del. Ch. May 28, 2010) ("A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested.").

18

*Rales* test, by contrast, has proved to be broad and flexible, and it encompasses the *Aronson* test as a special case.

### 1. *Aronson*

In 1984, after many decades during which Rule 23.1 did not play a major role in stockholder derivative litigation, the Delaware Supreme Court issued its landmark decision in *Aronson*. A stockholder plaintiff alleged that a board of directors could not evaluate a demand to bring litigation to challenge an earlier board decision made by the very same directors. *See Aronson*, 473 A.2d at 814. Relying on established precedent, the plaintiff argued that the directors self-evidently could not consider a demand because they had approved the challenged transaction and been named as defendants. *See id.* at 814, 817. After acknowledging that earlier Delaware cases had taken that approach,[3] the Delaware Supreme Court rejected it, explaining, "Were that so, the demand requirements of our law would be meaningless, leaving the clear mandate of Chancery Rule 23.1 devoid of its purpose and substance." *Id.* at 814.

---

[3] *See id.* at 814 (citing *McKee v. Rogers*, 156 A. 191, 193 (Del. Ch. 1931) (Wolcott, C.) ("It is manifest then that there can be no expectation that the corporation would sue [the defendant, who controlled the board], and if it did, it can hardly be said that the prosecution of the suit would be entrusted to proper hands."); *Miller v. Loft, Inc.*, 153 A. 861, 862 (Del. Ch. 1931) (Wolcott, C.) ("[I]f by reason of hostile interest or guilty participation in the wrongs complained of, the directors cannot be expected to institute suit, . . . no demand upon them to institute suit is [required]."); *Fleer v. Frank H. Fleer Corp.*, 125 A. 411, 414 (Del. Ch. 1924) (Wolcott, C.) ("Where the demand if made would be directed to the particular individuals who themselves are the alleged wrongdoers and who therefore would be invited to sue themselves, the rule is settled that a demand and refusal is not requisite.")). Other pre-*Aronson* precedents consistent with *McKee*, *Fleer*, and *Miller* could be cited.

The high court instead held that the question of demand futility was "inextricably bound to issues of business judgment . . . ." *Id.* at 812. For the *Aronson* court, this observation meant that the analysis of demand futility turned on whether the business judgment rule protected the decision being challenged. *Id.* The Delaware Supreme Court framed the resulting test as follows:

> Our view is that in determining demand futility the Court of Chancery . . . must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Hence, the Court of Chancery must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof.
>
> As to the latter inquiry the court does not assume that the transaction is a wrong to the corporation requiring corrective steps by the board. Rather, the alleged wrong is substantively reviewed against the factual background alleged in the complaint. As to the former inquiry, directorial independence and disinterestedness, the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board. Certainly, if this is an "interested" director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases. In that event futility of demand has been established by any objective or subjective standard.

*Id.* at 814–15 (formatting added). "In sum," the Delaware Supreme Court concluded, "the entire review is factual in nature." *Id.* at 815. The trial court "must be satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. Only in that context is demand excused." *Id.* at 815.

20

The *Aronson* decision thus called for two separate inquiries, each of which assessed the standard of review that would govern the claim for breach of fiduciary duty challenging the underlying decision. The first *Aronson* inquiry asked whether a disinterested and independent majority of directors had made that decision, which is a prerequisite to the application of the business judgment rule. *Id.* at 814. If the particularized allegations of the complaint established that the board lacked a disinterested and independent majority, then the protections of the business judgment rule would not be available to the directors when defending their prior decision, and demand was futile. *Id.*

The second *Aronson* inquiry asked whether the challenged decision "was otherwise the product of a valid exercise of business judgment." *Id.* The *Aronson* court envisioned that if the business judgment rule did not apply for some reason other than the absence of a majority of disinterested and independent directors (the subject of the first *Aronson* inquiry), then demand also would be excused. In *Aronson*, that possibility was front and center because the plaintiffs alleged that the challenged transaction constituted waste. *See id.* at 817.[4] The Delaware Supreme Court was engaged contemporaneously in

---

[4] Historically, waste derived from the *ultra vires* doctrine and stood outside the business judgment rule. *See generally* Harwell Wells, *The Life (and Death?) of Corporate Waste*, 74 Wash. & Lee L. Rev. 1239, 1243–48 (2017). At the time of *Aronson*, a viable waste claim thus would not be subject to the business judgment rule because, by definition, the decision was so extreme as to be beyond the directors' authority. *See Alcott v. Hyman*, 208 A.2d 501, 507 (Del. 1965); *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 58 (Del. 1952). Evidencing the different legal framework, non-unanimous stockholder ratification could not validate an action that constituted waste. *See Michelson v. Duncan*, 407 A.2d 211, 219 (Del. 1979). Contemporary Delaware decisions have brought waste within the

21

strengthening the duty of care,[5] and the *Aronson* decision stated that "to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties." 473 A.2d at 812. With the benefit of hindsight, it seems possible that the *Aronson* court also anticipated that entire fairness might apply based on a pled breach of the duty of care, as the Delaware Supreme Court subsequently held.[6]

---

fiduciary framework of the business judgment rule by re-conceiving of waste as a means of pleading that the directors acted in bad faith. *See, e.g.*, *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001) ("To prevail on a waste claim or a bad faith claim, the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."); *CanCan Dev., LLC v. Manno*, 2015 WL 3400789, at *20 (Del. Ch. May 27, 2015) (explaining that waste is "best understood as one means of establishing a breach of the duty of loyalty's subsidiary element of good faith"); *Se. Penn. Transp. Auth. v. AbbVie Inc.*, 2015 WL 1753033, at *14 n.144 (Del. Ch. Apr. 15, 2015) ("This Court has found that, doctrinally, waste is a subset of good faith under the umbrella of the duty of loyalty."), *aff'd*, 132 A.3d 1 (Del. 2016).

[5] The duty of care was a subject of much discussion and debate at the time. *See* Henry Ridgely Horsey, *The Duty of Care Component of the Business Judgment Rule*, 19 Del. J. Corp. L. 971, 996–97 (1994) (describing debates over duty of care that preceded *Aronson*). As part of its discussion of the duty of care, the *Aronson* court addressed an issue of first impression, stating that "under the business judgment rule director liability is predicated upon concepts of gross negligence." 473 A.2d at 812. Eight months later, the Delaware Supreme Court issued *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), its landmark decision on the duty of care.

[6] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 366–71 (Del. 1993). Justice Moore, the author of *Aronson*, also served on the panel that decided *Technicolor*.

Addressing a situation in which the same directors who would consider a demand had made the challenged decision, the *Aronson* court viewed the standard of review that would apply to the challenged decision as outcome determinative for purposes of demand futility. If the business judgment rule governed the challenged decision, then the directors did not face a substantial risk of liability from the lawsuit, and the lawsuit could not disable the directors from exercising business judgment regarding the demand. But if the entire fairness test governed—either because the board lacked a disinterested and independent majority when making the challenged decision or for some other reason—then the *Aronson* court regarded that fact as sufficient to render demand excused.[7]

In using the standard of review for the challenged transaction as a proxy for the risk of director liability and hence the test for demand futility, *Aronson* was a creature of its time. Subsequent jurisprudential developments severed the linkage between these concepts. Under current law, the application of a standard of review that is more onerous

---

[7] *See id.* at 815 ("Certainly, if this is an 'interested' director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases. In that event futility of demand has been established by any objective or subjective standard."); *id.* at 818 ("Unless facts are alleged with particularity to overcome the presumptions of independence and a proper exercise of business judgment, in which case the directors could not be expected to sue themselves, a bare claim of this sort raises no legally cognizable issue under Delaware corporate law."); *id.* ("In sum, we conclude that the plaintiff has failed to allege facts with particularity indicating that the Meyers directors were tainted by interest, lacked independence, or took action contrary to Meyers' best interests in order to create a reasonable doubt as to the applicability of the business judgment rule. Only in the presence of such a reasonable doubt may a demand be deemed futile.").

23

than the business judgment rule does not render demand futile. Similarly, the availability of exculpation means that a standard of review that is more onerous than the business judgment rule may not result in a substantial likelihood of liability.

The most obvious place to look for any continuing link between the application of a standard of review more onerous than the business judgment rule and a consequence of rendering demand futile is in cases involving interested transactions with a controlling stockholder. Authored in 1984, *Aronson* predated by more than a decade two watershed decisions from the Delaware Supreme Court which held that the entire fairness test applies inherently and from the outset ("*ab initio*") to an interested transaction involving a controlling stockholder. *See Kahn v. Tremont Corp.*, 694 A.2d 422, 428–29 (Del. 1997); *Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1115 (Del. 1994). The *Aronson* court thus could not have taken into account the implications of automatic-entire-fairness review on the demand futility analysis, even though the decisions at issue in *Aronson* involved interested transactions with a 47% stockholder. *See Aronson*, 473 A.2d at 808. After *Tremont* and *Lynch*, a natural reading of *Aronson*'s second prong would suggest that demand becomes futile when entire fairness applies *ab initio*. Former Chief Justice Strine once said as much while serving as a member of this court. *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1231 n.47 (Del. Ch. 2001) ("The complaint pleads particularized facts that suggest that the entire fairness standard of review—rather than the business judgement [sic] rule—would apply to the Transactions and that the Transactions might not have been fair. As a result, the complaint satisfies the second prong of *Aronson*."). Case law, however, developed in a different direction, with this court holding

24

that demand is not rendered futile under the second prong of *Aronson* simply because entire fairness applies *ab initio* to a transaction with a controlling stockholder.[8]

The *Aronson* decision also pre-dated the Delaware Supreme Court's open recognition of enhanced scrutiny as a third and intermediate standard of review.[9] Because the sibling strains of enhanced scrutiny create additional scenarios where the business judgment rule does not apply, a natural reading of *Aronson*'s second prong would suggest

---

[8] *See In re BGC P'rs, Inc.*, 2019 WL 4745121, at *7–8 (Del. Ch. Sept. 30, 2019); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 2015 WL 4192107, at *16 (Del. Ch. July 13, 2015). Both decisions relied on the indisputable fact that *Aronson* did not regard a transaction with a controlling stockholder as triggering entire fairness *ab initio* and hence rendering demand futile. As noted, that omission was likely an artifact of the timing of that subsequent doctrinal innovation. Both decisions also relied on *Beam*, in which a stockholder plaintiff sought to establish that demand was futile under *Aronson*. The corporation in *Beam* had a controlling stockholder, but as the *Baiera* decision recognized, the claim in *Beam* did not challenge a self-interested transaction with the controlling stockholder. It was therefore not a situation in which entire fairness would apply *ab initio*. *See Baiera*, 2015 WL 4192107, at *16. The Delaware Supreme Court's decision in *Beam* thus does not provide insight into how the second prong of *Aronson* would operate after *Tremont* and *Lynch*. As discussed below, the question is no longer meaningful because of the manner in which Section 102(b)(7) now operates at the pleading stage, even when entire fairness applies *ab initio*.

[9] The development of enhanced scrutiny can be traced to *Zapata*, a decision issued in 1981, three years before *Aronson*. *See, e.g.*, *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016). By 1984, it was not yet clear that enhanced scrutiny would emerge as a new standard of review. And rather than embracing and building on *Zapata*'s innovative approach, the *Aronson* court appears to have sought to calm the tempestuous response to *Zapata* by reassuring the business and legal community that the business judgment rule was alive and well. *See EZCORP*, 2016 WL 301245, at *26–27 (describing scope of practitioner and academic response to *Zapata* and the aspects of *Aronson* that appear intended to respond to criticism of the earlier decision).

that demand becomes futile when enhanced scrutiny applies. Here too, former Chief Justice Strine once said as much while serving as a member of this court, writing that if an enhanced scrutiny claim were assumed to be derivative, that characterization would not have any effect on a stockholder plaintiff's ability to sue because "[s]o long as the plaintiff states a claim implicating the heightened scrutiny required by *Unocal*, demand has been excused under the [*Aronson*] demand excusal test."[10] Once again, subsequent case law developed in a different direction, and authority now holds that demand is not futile simply because enhanced scrutiny applies. *See Ryan v. Armstrong*, 2017 WL 2062902, at \*13–14 (Del. Ch. May 15, 2017).

---

[10] *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 81 (Del. Ch. 1999). As support, then-Vice Chancellor Strine cited the following precedents: *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1071 (Del. Ch. 1985) ("In my view, the plaintiffs' complaints, which set forth particularized facts alleging that the Rights Plan deters all hostile takeover attempts through its limitation on alienability of shares and the exercise of proxy rights, sufficiently pleads a primary purpose to retain control, and thus casts a reasonable doubt as to the disinterestedness and independence of the board at this stage of the proceedings."), *aff'd*, 500 A.2d 1346 (Del. 1985); *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1189 (Del. Ch. 1998) ("Even if the claims were regarded as derivative, the complaint's entrenchment allegations are sufficient to excuse compliance with the demand requirement."); *Wells Fargo & Co. v. First Interstate Bancorp*, 1996 WL 32169, at \*8 (Del. Ch. Jan. 18, 1996) (Allen, C.) ("With respect to the entrenchment claim, it seems clear that factual allegations which, if true, are sufficient to shift the burden to defendants to meet the 'enhanced business judgment' test of *Unocal* are similarly sufficient to raise a reasonable doubt concerning the board's ability to make a binding business judgment, whether one focuses on a judgment to resist the Wells Fargo offer or on the hypothetical judgment that this board would make if asked to institute this law suit."); *In re Chrysler Corp. S'holders Litig.*, 1992 WL 181024, at \*4–5 (Del. Ch. July 27, 1992) (holding that directors' decision to lower rights plan trigger created sufficient inference of entrenchment to excuse demand).

Perhaps most significantly, *Aronson* predated by two years the enactment of Section 102(b)(7) of the Delaware General Corporation Law, which authorizes the certificate of incorporation of a Delaware corporation to contain a provision

> eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 *Del. C.* § 102(b)(7). Exculpatory provisions shield directors from personal liability for monetary damages, except as to the four identified categories. "The totality of these limitations or exceptions . . . is to . . . eliminate . . . director liability only for 'duty of care' violations. With respect to other culpable directorial actions, the conventional liability of directors for wrongful conduct remains intact." 1 David A. Drexler et al., *Delaware Corporation Law and Practice*, § 6.02[7], at 6-18 (2019).

The presence of an exculpatory provision has significant implications for the risk of liability faced by outside directors, even in a lawsuit challenging a self-dealing transaction involving a controlling stockholder for which entire fairness is the operative standard of review. When a corporation has an exculpatory provision and a self-dealing transaction has been determined to be unfair, "only the self-dealing director [is] subject to damages liability for the gap between a fair price and the deal price without an inquiry into his subjective state of mind." *Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008). For other directors,

27

even the ones who might be deemed non-independent by status, the presence of the exculpatory charter provision . . . require[s] an examination of their state of mind, in order to determine whether they breached their duty of loyalty by approving the transaction in bad faith . . . , rather than in a good faith effort to benefit the corporation.

*Id.* at *23. "In other words, their status [as non-independent directors] is only a fact relevant to the ultimate determination whether they complied with their fiduciary duties, it is not a status crime making them a guarantor of the fairness of the transaction." *Id.* Instead, "[t]he liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." *In Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004).

After the turning of the millennium, this court began to confront arguments that Section 102(b)(7) affected the analysis of the second prong of *Aronson*.[11] A line of

---

[11] The first case to address this argument appears to have been this court's second pleading-stage decision in the *Disney* litigation, rendered after the Delaware Supreme Court affirmed the original dismissal but granted the plaintiffs leave to re-plead. *See In re Walt Disney Co. Deriv. Litig.* (*Disney III*), 825 A.2d 275 (Del. Ch. 2003). The *Disney III* opinion described "[t]he primary issue before the Court [as] whether plaintiffs' new complaint survives the Rule 23.1 motion to dismiss under the second prong of *Aronson v. Lewis*." *Id.* at 285–86. The court observed that the defendants had argued that the complaint alleged, at most, a breach of the duty of care, and that even if it stated a claim, "Disney's charter provision, based on 8 *Del. C.* § 102(b)(7), would apply and the individual directors would be protected from personal damages liability for any breach of their duty of care." *Id.* at 286. The court held that the complaint stated a claim for bad faith, but framed its holding as if Section 102(b)(7) operated to qualify the second prong of *Aronson*:

> A fair reading of the new complaint, in my opinion, gives rise to a reason to doubt whether the board's actions were taken honestly and in good faith, as

decisions asserted that when a corporation had a Section 102(b)(7) provision, the second

prong of *Aronson* would result in demand being futile only if the underlying transaction

*both* was not protected by the business judgment rule *and* the plaintiff had pled

particularized facts supporting a non-exculpated claim.[12] When these decisions grounded

their analysis in *Aronson*, they relied on the Delaware Supreme Court's statement that

> the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.

*Aronson*, 473 A.2d 815. A natural reading of this language does not suggest that it required

a substantial likelihood of liability *in addition to* a standard of review more onerous than

---

> required under the second prong of *Aronson*. Since acts or omissions not undertaken honestly and in good faith, or which involve intentional misconduct, do not fall within the protective ambit of § 102(b)(7), I cannot dismiss the complaint based on the exculpatory Disney charter provision.

*Id.* Subsequent cases have identified *Disney III* as the earliest case to introduce Section 102(b)(7) to the second prong of *Aronson*. *See, e.g.*, *Lenois v. Lawal*, 2017 WL 5289611, at *14 (Del. Ch. Nov. 7, 2017); *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *12 (Del. Ch. Oct. 12, 2011).

[12] *See Goldman Sachs*, 2011 WL 4826104, at *12 (applying Section 102(b)(7) as an overlay to the second prong of *Aronson*; holding that as a result, the plaintiffs had to plead facts "amounting to bad faith" to satisfy the second prong); *Guttman v. Huang*, 823 A.2d 492, 501–02, 507 (Del. Ch. 2003) (same); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008) (holding that for purposes of the second prong of *Aronson*, the presence of an exculpatory provision "requires the plaintiffs to plead particularized facts supporting an inference that the directors committed a breach of the fiduciary duty of loyalty").

the business judgment rule. The passage rather equated a substantial likelihood of liability

with the application of a standard more onerous than the business judgment rule. Hence,

the quoted passage stated that there may be settings in which the business judgment rule

does not apply "and a substantial likelihood of director liability *therefore* exists." *Id.*

(emphasis added). The decisions that incorporated Section 102(b)(7) into the second prong

of *Aronson* transmuted this language into a requirement that the business judgment rule not

apply and a substantial likelihood of director liability *also* exist. As the emerging approach

took hold, other decisions hewed to a more natural reading of *Aronson*'s second prong that

did not require a substantial likelihood of liability in addition to a standard more onerous

than the business judgment rule.[13]

---

[13] *See, e.g.*, *McPadden v. Sidhu*, 964 A.2d 1262, 1272–73 (Del. Ch. 2008) (holding that demand was futile under second prong of *Aronson* because the directors were grossly negligent, even though the directors were entitled to exculpation and dismissed from the case on that basis); *Khanna v. McMinn*, 2006 WL 1388744, at *25 n.201 (Del. Ch. May 9, 2006) (explaining the "tension" between a strict reading of *Aronson*'s second prong, which would render demand futile if the business judgment rule did not apply, and the effect of an exculpatory provision in limiting whether a director faced a substantial threat of liability; following then-current law, under which a court could not rely on an exculpatory provision at the pleading stage unless it was clear that the claim resulted exclusively from a breach of the duty of care); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005) (stating that plaintiffs could establish demand excusal under the second prong of *Aronson* by pleading "particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision" (internal quotation marks omitted)); *see also Emerald P'rs v. Berlin*, 1993 WL 545409, at *7–8 (Del. Ch. Dec. 23, 1993) (rejecting argument that Section 102(b)(7) should overlay the *Aronson* test).

During the years when Section 102(b)(7) was emerging as a consideration under the second prong of *Aronson*, there was uncertainty about the extent to which defendants could invoke Section 102(b)(7) at the pleading stage to obtain dismissal when entire fairness provided the standard of review. Delaware Supreme Court precedent at the time indicated that a court's ability to assess the availability of exculpation at the pleading stage depended on the standard of review, and that a court could not dismiss a defendant based on exculpation at the pleading stage if entire fairness applied.[14] Under this framework, exculpation operated as an affirmative defense, and director defendants could "avoid

---

[14] *Compare Emerald P'rs v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999) (holding that in a challenge to a transaction with majority stockholder to which entire fairness applied, the court could not apply Section 102(b)(7) on motion for summary judgment because transaction implicated loyalty issues, and factual conflicts required a trial to determine nature of the duty breached), *with Malpiede v. Townson*, 780 A.2d 1075, 1094–96 (Del. 2001) (holding that in a challenge to third-party, arm's-length merger that was approved by fully informed stockholder vote, court could apply Section 102(b)(7) at pleading stage unless plaintiff pled facts sufficient to show that a majority of the board was not disinterested or independent), *with Emerald P'rs v. Berlin*, 787 A.2d 85, 93–94 (Del. 2001) (holding that in challenge to transaction with majority stockholder to which entire fairness applied, court could not apply Section 102(b)(7) without first analyzing transaction under entire fairness standard to determine nature of the fiduciary breach). *See generally* Drexler, *supra*, § 6.02[7], at 6-21. This approach recognized that by shifting the burden of proof, the entire fairness test operated as the functional equivalent of a rebuttable presumption of unfairness. *See* D.R.E. 301(a) ("In a civil case, unless a statute or these Rules provide otherwise, the party against whom a presumption is directed has the burden of proving that the nonexistence of the presumed fact is more probable than the existence of the presumed fact."). Put differently, by pleading facts sufficient to show at the pleading stage that the entire fairness test applied, the plaintiff established a rebuttable presumption of breach and threw the burden on to the defendant to establish either that there was no breach because the transaction was entirely fair or that any breach resulted exclusively from a breach of the duty of care. With inferences drawn in favor of the plaintiff, the defendants could not carry those burdens at the pleading stage.

personal liability for paying monetary damages only if they ha[d] established that their failure to withstand an entire fairness analysis is exclusively attributable to a violation of the duty of care." *Emerald P'rs*, 787 A.2d at 98; *accord id.* at 91, 93. For purposes of the second prong of *Aronson*, that meant that if the pleadings indicated that entire fairness provided the standard of review, then there was reason to doubt that the directors would be entitled to exculpation. Moreover, the Delaware Supreme Court had held that when entire fairness applied, the nature of a director's breach could not be determined until after trial, and hence, the directors would have their actions scrutinized and potentially called into question. *Emerald P'rs*, 787 A.2d at 94. The prospect of public scrutiny, potential reputational harm, and possible liability combined to mean that when entire fairness applied, there was reason to doubt that a director could exercise disinterested and independent judgment regarding a demand.

In 2015, the Delaware Supreme Court clarified how Section 102(b)(7) operates at the pleading stage. Rejecting any distinction based on the standard of review, the high court explained that when a corporation's charter contains an exculpatory provision,

> [a] plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct—be it *Revlon*, *Unocal*, the entire fairness standard, or the business judgment rule.

*In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1175–76 (Del. 2015) (footnotes omitted). "So applied, the existence of an exculpatory provision operates more in the nature of an immunity, comparable to the extent to which sovereign immunity typically protects government employees from suit, rather than as an affirmative defense."

32

*In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 130 A.3d 934, 940 (Del. 2016).

The *Cornerstone* decision sapped any continuing vitality from *Aronson*'s use of the standard of review for the challenged decision as a proxy for whether directors face a substantial likelihood of liability sufficient to render demand futile. After *Cornerstone*, no matter what standard of review applies, a plaintiff can only state a claim against an individual director under the more lenient pleading standard used for Rule 12(b)(6) by "pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." 115 A.3d at 1179–80. Reframed using the heightened pleading standard required for Rule 23.1, a plaintiff seeking to show that a director faces a substantial likelihood of liability for having approved a transaction, no matter what standard of review applies, must plead particularized facts providing a reason to believe that the individual director was self-interested, beholden to an interested party, or acted in bad faith.

Since *Cornerstone*, Delaware decisions have consistently interpreted the second prong of *Aronson* as requiring *both* that a standard more onerous than the business judgment applies *and* that a majority of the directors face a substantial likelihood of liability on a non-exculpated claim.[15] The application of a standard of review more onerous

---

[15] *See Ellis v. Gonzalez*, 2018 WL 3360816, at *6 (Del. Ch. July 10, 2018) (post-*Cornerstone* decision explaining that Section 102(b)(7) clause will affect analysis under "either *Aronson* or *Rales*" when determining whether the complaint adequately alleges that

than the business judgment rule no longer implies the existence of a substantial likelihood of liability, as *Aronson* assumed. After *Cornerstone*, the first prong of *Aronson* remains viable, but only because the requirements for satisfying the first prong of *Aronson* also create a pleading-stage inference that exculpation will be unavailable to directors comprising a majority of the Board.[16] The second prong of *Aronson* remains viable only in the unlikely event that a corporation lacks a Section 102(b)(7) provision, or to the extent that the particularized factual allegations portray a transaction that is so extreme as to

a director "faces a substantial likelihood of liability"); *Steinberg v. Bearden*, 2018 WL 2434558, at \*7 n.54 (Del. Ch. May 30, 2018) (post-*Cornerstone* decision holding that because corporation had an exculpatory charter provision, it was "inconsequential which test applies [i.e., *Rales* or *Aronson*], because under both *Rales* and *Aronson*, the relevant inquiry is whether Steinberg has pled sufficiently a non-exculpated claim for bad faith against a majority of the Board"); *Lenois*, 2017 WL 5289611, at \*14 (post-*Cornerstone* decision holding that "where an exculpatory charter provision exists, demand is excused as futile under the second prong of *Aronson* with a showing that a majority of the board faces a substantial likelihood of liability for non-exculpated claims"); *see also Stritzinger v. Barba*, 2018 WL 4189535, at \*5 (Del. Ch. Aug. 31, 2018) (post-*Cornerstone* decision observing that "[t]here appears to be some confusion in our law whether the 'substantial likelihood of liability' theory used to challenge the impartiality of a director for demand futility purposes fits within the analysis contemplated by the first or second prong of *Aronson*," but applying test that required a showing of disloyalty or bad faith, i.e., a test that considered whether directors faced a substantial risk of liability and whether exculpation would be available).

[16] Isolated decisions have made this linkage more visible by considering whether directors faced a substantial risk of liability from a claim when evaluating whether they were disinterested and independent for purposes of the first prong of *Aronson*. *See Friedman v. Khosrowshahi*, 2014 WL 3519188, at \*10–11 (Del. Ch. July 16, 2014), *aff'd*, 2015 WL 1001009 (Del. Mar. 6, 2015) (ORDER); *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at \*6 (Del. Ch. Nov. 3, 2014); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at \*18 (Del. Ch. May 5, 2010); *see also DiRienzo v. Lichtenstein*, 2013 WL 5503034, at \*23 (Del. Ch. Sept. 30, 2013).

34

suggest bad faith. *See infoUSA*, 953 A.2d at 972 (explaining that to render demand futile under the second prong of *Aronson*, a plaintiff "faces a task closely akin to proving that the underlying transaction *could not have been* a good faith exercise of business judgment"). That option remains viable under Section 102(b)(7) because pleading bad faith is one means of pleading that exculpation is not available. For both prongs, exculpation dominates the analysis. The standard of review is secondary.

As this analysis shows, Delaware's evolving jurisprudence, and particularly the pleading-stage application of Section 102(b)(7) under *Cornerstone*, have dismantled the logic of *Aronson*. Viewed on its own terms, *Aronson* is no longer a functional test. Delaware decisions have managed to continue applying it only by emphasizing the overarching question of a substantial likelihood of liability, incorporating the implications of exculpation, and de-emphasizing the role of the standard of review. The foundational premise of the decision, which relied on the standard of review for the challenged decision as a proxy for whether directors face a substantial likelihood of liability, no longer endures. Fortunately, a viable alternative exists.

### 2. *Rales*

The narrow factual setting that produced the *Aronson* decision—in which the same directors who made the challenged decision also would consider the demand—and the close tailoring of the *Aronson* test to that factual setting meant that the two prongs of *Aronson* did not translate easily to other scenarios. In *Rales*, the Delaware Supreme Court confronted a board whose members had not participated in the challenged decision, and therefore "the test enunciated in *Aronson* . . . [was] not implicated." 634 A.2d at 930. In

35

response, the high court framed a second, more straightforward, and more comprehensive demand futility standard that asks "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934.

The significant advance made by *Rales* was to refocus the inquiry on the decision regarding the litigation demand, rather than the decision being challenged. In *Rales*, this step was necessary because the demand board had not made the decision being challenged. *See id.* at 933. The *Rales* decision thus asked directly "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations." *Id.* at 934. Although necessity birthed this shift, the solution has the virtue of posing the pertinent question directly, rather than backing into an answer indirectly.

Under *Rales*, a director is disqualified from exercising judgment regarding a litigation demand if the director was interested in the alleged wrongdoing, such as when the director received a personal benefit from the wrongdoing that was not equally shared from the stockholders. *Id.* at 936. A director also is disqualified from exercising judgment regarding a litigation demand if another person was interested in the alleged wrongdoing, and the director lacks independence from that person. *Id.* Although these aspects of the *Rales* inquiry look to the relationship between the alleged wrongdoing and the directors considering the litigation demand, they do so for purposes of analyzing the directors'

36

ability to evaluate the litigation demand, not to determine the standard of review that would apply to the alleged wrongdoing.

> The *Rales* decision further explained that

> [d]irectorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.

*Id.* The *Rales* court held that a director is compromised for purposes of considering a demand if the director faces a risk from litigation that goes beyond a "mere threat" and reaches the level of a "substantial likelihood" of liability. *Id.* (internal quotation marks omitted). The *Rales* court rejected the argument that a plaintiff must demonstrate "a reasonable probability of success" on the claim, describing that requirement as "unduly onerous." *Id.* at 934–35. Although framed as a "substantial likelihood" of liability, the standard thus only requires that plaintiffs "make a threshold showing, through the allegation of particularized facts, that their claims have some merit." *Id.* at 934.

In a case in which one or more of the directors who are considering the litigation demand participated in the alleged wrongdoing that the derivative action would challenge, a court must conduct the same inquiry called for by contemporary interpretations of *Aronson* to determine whether those directors face a substantial likelihood of liability. As in *Aronson*, if the underlying claim is for breach of fiduciary duty, then the court must determine what standard of review would apply to that claim and take that standard into account when assessing whether a substantial likelihood of liability exists. The *Rales* approach also seamlessly accommodates derivative claims in which the plaintiff seeks to

37

assert a corporate cause of action does not involve a claim for breach of fiduciary duty against the directors.[17] The *Aronson* framework has no tools to address any legal theory other a claim for breach of fiduciary duty against the same directors who would consider the demand.

Delaware decisions have consistently recognized that for purposes of analyzing whether a director faces a substantial likelihood of liability under *Rales*, a court must take into account the availability of exculpation under Section 102(b)(7).[18] Expressing

---

[17] *See* 3 Stephen A. Radin, *The Business Judgment Rule* 3612 (6th ed. 2009) ("'Any claim belonging to the corporation may, in appropriate circumstances, be asserted in a derivative action,' including claims that do—and claims that do not—involve corporate mismanagement or breach of fiduciary duty.") (quoting *Midland Food Servs., LLC v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999)); *see, e.g.*, *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999) (permitting "contract actions brought derivatively by shareholders on behalf of the contracting corporation"); *Slattery v. United States*, 35 Fed. Cl. 180, 183 (1996) (same); *Suess v. United States*, 33 Fed. Cl. 89, 93 (Fed. Cl. 1995) (denying motion to dismiss a derivative claim for breach of contract against the United States); *see also Ross v. Bernhard*, 396 U.S. 531, 542-43 (1970) (holding right to jury trial existed for breach of contract claim asserted by stockholder derivatively because "[t]he corporation, had it sued on its own behalf, would have been entitled to a jury's determination").

[18] *See, e.g.*, *Oracle*, 2018 WL 1381331, at *14–15, *20; *Baiera*, 119 A.3d at 62–63; *Zucker*, 2012 WL 2366448, at *10–11; *Goldman Sachs*, 2011 WL 4826104, at *12, *18; *Guttman*, 823 A.2d at 501–02; *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995); *see also Wood*, 953 A.2d 136, 142 (Del. 2008) (evaluating demand futility under *Rales* in context of limited liability company; holding that if "directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts" (emphasis in original) (internal quotation marks omitted)); *DiRienzo*, 2013 WL 5503034, at *28 (applying contractual exculpation provisions in partnership agreement when evaluating whether general partner faced a substantial likelihood of liability sufficient to render demand futile). Many of these

sentiments equally applicable to the second prong of *Aronson*, this court has explained that after *Cornerstone*, the fact that entire fairness may govern the underlying claim does not give rise to substantial likelihood of liability for purposes of considering a demand *unless* the complaint pleads facts sufficient to raise a reasonable doubt that the director would not be entitled to exculpation.[19]

When announcing the *Rales* test, the Delaware Supreme Court envisioned that *Aronson* would remain the predominant approach and that the *Rales* test would be used

> in three principal scenarios: (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation.

---

decisions address *Caremark* claims. Ironically, in that setting, exculpatory provisions are superfluous because the Delaware Supreme Court has held that pleading a *Caremark* claim requires the complaint to support a reasonable inference bad faith. *See Stone*, 911 A.2d at 370 (holding that "a showing of bad faith conduct . . . is essential to establish director oversight liability" and therefore "the fiduciary duty violated by that conduct is the duty of loyalty"). Consequently, even in a corporation without an exculpatory provision, a complaint asserting a *Caremark* claim must plead bad faith to survive pleading-stage analysis. Likewise, a validly pled *Caremark* claim is unaffected by the presence of a Section 102(b)(7) because the a viable *Caremark* claim supports an inference of bad faith that defeats exculpation. Section 102(b)(7) therefore logically cannot affect the analysis of a *Caremark* claim.

[19] *Sandys v. Pincus* (*Sandys I*), 2016 WL 769999, at *13–14 (Del. Ch. Feb. 29, 2016), *rev'd on other grounds*, 152 A.3d 124 (Del. 2016); *see Oracle*, 2018 WL 1381331, at *10–15, *22 & n.287 (analyzing whether directors faced substantial risk of liability for purposes of Rule 23.1 based on whether complaint's allegations supported a non-exculpated claim; noting that entire fairness standard applied to purchase of company belonging to controlling stockholder).

*Rales*, 634 A.2d at 934. (footnotes omitted). In practice, however, the *Aronson* scenario is the exception. Changes in board composition are common, and the majority-of-directors principle that ostensibly creates a binary dividing line between *Aronson* and *Rales* leaves courts to wonder what standard should apply to the new directors who have joined the board. Those directors could have relationships that would compromise their independence, which a strict application of *Aronson* would not take into account. As a practical matter, therefore, the broader *Rales* test must be used to evaluate any new directors who join the board, leading to a hybrid of *Aronson* and *Rales*.

For these and other reasons, leading commentators have argued that "the current state of this area of the law is conceptually inverted; i.e., that it would be both simpler and more direct to regard the original *Aronson* analysis as a subpart of the more generally applicable and consistently relevant test set forth in *Rales*." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11.03[c][4][ii], at 11-113 (2019). Consistent with this view, decisions from the Court of Chancery have explained on multiple occasions that *Rales* encompasses *Aronson* and should be used as the general test.[20] As this decision has shown, *Aronson* is broken in its

---

[20] *See Hughes v. Hu*, 2020 WL 1987029, at \*12 (Del. Ch. Apr. 27, 2020) ("Conceptually, . . . the *Rales* test supersedes and encompasses the *Aronson* test, making the *Aronson* test a special application of *Rales*."); *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 2016 WL 2908344, at \*11 (Del. Ch. May 13, 2016) ("[T]he *Rales* test encompasses all relevant aspects of the *Aronson* test."); *Baiera*, 119 A.3d at 67 n.131 ("[O]ur jurisprudence would benefit . . . from the adoption of a singular test to address the question of demand futility."); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL

own right because subsequent jurisprudential developments have rendered non-viable the core premise on which *Aronson* depends—the notion that an elevated standard of review standing alone results in a substantial likelihood of liability sufficient to excuse demand. The Delaware Supreme Court already has overruled *Aronson* in part. *See Brehm*, 746 A.2d at 253–54. Perhaps the time has come to move on from *Aronson* entirely.

### 3. The Test In This Case

The composition of the Board in this case exemplifies the difficulties that the *Aronson* test struggles to overcome. The Board has nine members, six of whom served on the Board when it approved the Reclassification. Under a strict reading of *Rales*, because the Board does not have a new majority of directors, *Aronson* provides the governing test. But one of those six directors abstained from the vote on the Reclassification, meaning that the *Aronson* analysis only has traction for five of the nine. *Aronson* does not provide guidance about what to do with either the director who abstained or the two directors who

---

391931, at \*4 (Del. Ch. Feb. 13, 2006) ("[T]he *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination"), *aff'd*, 911 A.2d 802 (Del. 2006) (ORDER); *Huang*, 823 A.2d at 501 ("At first blush, the *Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry . . . . Upon closer examination, however, that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*."); *see also Buckley Family Trust v. McCleary*, 2020 WL 1522549, at \*9 (Del. Ch. Mar. 31, 2020) ("This court has commented on many occasions that the *Aronson* and *Rales* tests look different but they essentially cover the same ground."); *Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chicago v. Smith*, 2017 WL 1382597, at \*5 (Del. Ch. Apr. 18, 2017) ("The analyses in both *Rales* and *Aronson* drive at the same point; they seek to assess whether the individual directors of the board are capable of exercising their business judgment on behalf of the corporation.").

41

joined the Board later. The director who abstained from voting on the Reclassification suffers from other conflicts that renders her incapable of considering a demand, yet a strict reading of *Aronson* only focuses on the challenged decision and therefore would not account for those conflicts. Similarly, the plaintiff alleges that one of the directors who subsequently joined the Board has conflicts that render him incapable of considering a demand, but a strict reading of *Aronson* would not account for that either. Precedent thus calls for applying *Aronson*, but its analytical framework is not up to the task. The *Rales* test, by contrast, can accommodate all of these considerations.

This decision therefore applies *Rales* as the general demand futility test. In doing so, this decision draws upon *Aronson*-like principles when evaluating whether particular directors face a substantial likelihood of liability as a result of having participated in the decision to approve the Reclassification. Rather than trifurcating the analysis into a first prong of *Aronson*, a second prong of *Aronson*, and *Rales*, this decision proceeds on a director-by-director basis, asking for each director (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand, (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand, and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

In determining whether the director would face a substantial likelihood of, this decision considers *both* the operative standard of review, as called for by the original

42

*Aronson* decision, *and* the potential availability of exculpation, as subsequent re-interpretations of *Aronson* recognize is necessary. Under *Cornerstone*, whether a director faces a substantial likelihood of liability turns primarily on whether the allegations of the complaint are sufficient to overcome the pleading-stage operation of Section 102(b)(7). As part of that analysis, this decision considers whether the complaint pleads particularized facts that support a reasonable inference that the director's decision could be attributed to bad faith. This inquiry both recognizes the only situation in which the second prong of *Aronson* has continuing vitality and identifies a scenario in which the pled facts render exculpation unavailable.[21]

## B.    The Transaction For Purposes Of Analyzing Demand Futility

Before turning to the director-by-director analysis, it is necessary to examine "the nature of the decision confronting" the Board. *Rales*, 634 A.2d at 935. Demand futility is assessed based on the particular corporate claim that a stockholder plaintiff wishes to assert. *Baiera*, 119 A.3d at 58 n.71. Framing the corporate claim properly is an important step in the demand futility analysis, because a director might be able to exercise disinterested and independent judgment for purposes one claim, but not for purposes of another.

---

[21] *See Sandys I*, 2016 WL 769999, at *13–14; *Goldman Sachs*, 2011 WL 4826104, at *12.

In this case, the plaintiff seeks to recover damages that Facebook suffered as a result of the individual defendants having breached their fiduciary duties by approving the Reclassification. In the Reclassification Action, other stockholder plaintiffs challenged the Reclassification itself, and they sought permanent injunctive relief to block Facebook from completing it. Just before trial, Zuckerberg asked the Board to withdraw the Reclassification, and the Board complied. By doing so, the Board gave the plaintiffs in the Reclassification Action all of the relief they sought, rendering that action moot.

When a challenged transaction goes away, "the absence of *transactional* damages arising out of the abandoned deal does not necessarily render the underlying claims moot." *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 716 (Del. Ch. 2014) (emphasis in original). If a plaintiff proves that defendant directors breached their fiduciary duties by pursuing the abandoned transaction, then "[e]quity may require that the directors of a Delaware corporation reimburse the company for sums spent pursuing such faithless ends." *infoUSA*, 953 A.2d at 996. Equity also may require disgorgement of any benefit received by the defendant fiduciaries. *See Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("[T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position."). *See generally Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 437, 445 (Del. 1996) (holding that despite the absence of transactional damages from an abandoned transaction, the controlling stockholders were "liable for damages incidental to their breach of duty," which included "any expenses, including legal and due diligence costs, that the corporation incurred to accommodate the [controlling stockholders'] pursuit of their own interests prior to the deal being abandoned").

44

The plaintiff relies on these principles in this case. The plaintiff contends that the individual defendants breached their fiduciary duties when approving the Reclassification, which led to Facebook incurring what might be thought of as reliance damages, i.e., expenses for professionals who worked on pursuing the Reclassification and defending the resulting litigation, as well as lost employee time that otherwise could have been spent on Facebook's business. They also maintain that Facebook suffered reputational harm and a loss of goodwill.

These types of damages arguably flow from the decision to approve the Reclassification. Viewed in this light, the proper inquiry for purposes of demand futility is whether the director could exercise disinterested and independent judgment with respect to a decision to embark on litigation over the Reclassification. If a director received a material personal benefit from the Reclassification, would face a substantial likelihood of liability in connection with a lawsuit challenging the Reclassification, or was not independent of someone who did or would, then that director cannot exercise disinterested and independent judgment regarding a demand.

The defendants disagree with this reasoning. They argue that this court must Balkanize its analysis by examining separately the decisions to retain each financial advisor and law firm. By slicing and dicing the decisions, the defendants can argue more persuasively that the members of the Board could exercise disinterested and independent judgment regarding a demand. For example, assuming that Zuckerberg was interested in the Reclassification, could he really be deemed interested in the Committee's decision to retain a financial advisor? Or the defendants' decision to retain litigation counsel?

45

The defendants also ask the court to analyze separately plaintiff's effort to recover the award of attorneys' fees and expenses that Facebook paid to the plaintiffs' counsel in the Reclassification Action. It is unclear under extant precedent whether the decision to withdraw the Reclassification would constitute a separate decision for purposes of demand futility, or whether it would be sufficiently connected to the Reclassification such that the Reclassification itself would remain the focus for demand-futility purposes. The defendants argue that the decision to withdraw the Reclassification was a separate decision, distinct from the initial decision to approve the Reclassification. And they maintain that the decision to pay a fee to plaintiffs' counsel in the Reclassification Action was another separate decision. They conclude that even if certain directors might not be able to exercise disinterested and independent judgment regarding a litigation demand challenging the Reclassification itself, there is no reason for any potential taint to extend to the decisions to withdraw the Reclassification and to pay a fee to plaintiffs' counsel.

Fortunately, this decision need not express a view on these questions. The plaintiff plainly believes that that its best case for establishing demand futility is to focus on the Reclassification. For the reasons described below, this decision adopts that framework and nevertheless finds that demand is not excused. It is therefore unnecessary to address whether the defendants could also prevail on a Rule 23.1 motion by grinding the analysis more finely.

## C.    The Director-By-Director Analysis

When the complaint was filed, the members of the Board were:

- defendant Zuckerberg, the primary beneficiary of the Reclassification;

46

- defendants Andreessen, Desmond-Hellmann, Bowles, who were the members of the Committee that approved the Reclassification;

- defendant Peter Thiel, who has served as a director of Facebook since April 2005 and who voted to approve the Reclassification;

- defendant Reed Hastings, who has served as a director of Facebook since June 2011 and who voted to approve the Reclassification;

- nonparty Sandberg, who has served as the COO of Facebook since March 2008 and a director of Facebook since January 2012;

- nonparty Kenneth Chenault, who became a director after the Board approved the Reclassification; and

- nonparty Jeffrey Zients, who became a director after the Board approved the Reclassification.

This decision refers to these directors as the "Demand Board."

The fundamental question presented by the defendants' motion is whether the Demand Board validly could consider a litigation demand. The answer to that question depends on whether a majority of the members of the Demand Board would be disinterested and independent with respect to the litigation demand. Because the Demand Board has nine members, demand is excused if five directors could not exercise disinterested and independent judgment regarding a litigation demand. Conversely, demand is futile if the complaint's allegations establish a reason to doubt whether five directors could exercise disinterested and independent judgment regarding a demand.

For purposes of analyzing demand futility, this decision makes the following pro-plaintiff assumptions:

- The Reclassification would be subject to review under the entire fairness test for the reasons explained in *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964 (Del. Ch. Dec. 11, 2017). Unlike the transaction at issue in *Crane*, the

47

Reclassification did not follow the template set out in *Kahn v. M & F Worldwide, Corp.*, 88 A.3d 635 (Del. 2014), so entire fairness would remain the operative standard of review.

- At a minimum, Andreesen's back-channel communications with Zuckerberg prevented the Committee from functioning effectively. As a result, the burden of proof would not shift to the plaintiff to prove unfairness, but rather would remain with the defendants to establish that the Reclassification was entirely fair.

- There is a substantial likelihood that the court would conclude after trial that the Reclassification was not entirely fair to Facebook's non-controlling stockholders.

- Zuckerberg could not exercise disinterested and independent judgment regarding a demand. As the controlling stockholder of Facebook, he received a material personal benefit from the Reclassification, and he would face a substantial risk of liability on a claim challenging it. Zuckerberg would not be entitled to exculpation because (i) he stood on both sides of the transaction and (ii) the plain language of Section 102(b)(7) does not extend to controlling stockholders.

- Andreesen could not exercise disinterested and independent judgment regarding a demand. Based on his back-channel communications during the Committee process and self-professed fealty to Zuckerberg, he is not independent of Zuckerberg and he would face a substantial risk of liability on a claim challenging the Reclassification. He would not be entitled to exculpation because he acted disloyally and in bad faith.

- Sandberg could not exercise disinterested and independent judgment regarding a demand. As Facebook's longstanding COO, she is not independent of Zuckerberg.

These assumptions leave six directors for consideration: Zients, Chenault, Hastings, Thiel, Bowles, and Desmond-Hellmann. If five of these six directors could exercise independent and disinterested judgment regarding a demand, then demand is not futile, and the complaint must be dismissed.

### 1. Zients

The complaint fails to plead facts supporting a reason to doubt that Zients could exercise disinterested and independent judgment regarding a demand. Zients joined the Board in May 2018, after the Board had approved the Reclassification. He is an outside

48

director. There is no suggestion that he received any benefit from the Reclassification, and the plaintiff does not advance any argument about why he is not independent. Zients is deemed capable of exercising disinterested and independent judgment regarding a demand.

### 2. Chenault

The complaint fails to plead facts supporting a reason to doubt that Chenault could exercise disinterested and independent judgment regarding a demand. Chenault joined the Board in February 2018, after the Board had approved the Reclassification. There is no suggestion that he received any benefit from the Reclassification.

The complaint's only basis for questioning Chenault's ability to consider a demand is to assert that he is beholden to Zuckerberg, but the complaint does not plead any facts that undermine Chenault's independence. The complaint points to a Facebook post in which Zuckerberg announced that Chenault had joined the Board and said that he had been "trying to recruit [Chenault] for years." Compl. ¶ 107. Continuing, Zuckerberg stated,

> Adding someone to our board is one of the most important decisions our board makes. It's a long process that I take very seriously since this is the group that ultimately governs Facebook. [Chenault] and I have had dinners discussing our mission and strategy for years, and he has already helped me think through some of the bigger issues I'm hoping we take on this year.

*Id.*

The plaintiff asserts that this post suggests a close personal friendship that could compromise Chenault's independence, but that is a logical leap and not a reasonable inference. It is both expected and customary for a chair and CEO to comment favorably on a new director who is joining the board. Nothing about the post suggests a relationship of a bias-producing nature. *See Beam*, 845 A.2d at 1045, 1050–51 (rejecting as insufficient

49

allegations that a director was "old friend" of the controller and was "recruited for the board" by the controller).

The complaint also alleges that in 2018, Chenault became the chair and a Managing Director of General Catalyst Partners, an early stage venture capital firm. The complaint alleges that Chenault "will rely on Zuckerberg for 'deal flow,'" making him beholden to Zuckerberg. Compl. ¶ 107. The complaint does not allege any specific facts to support this conclusory allegation, which seems based on nothing more than Chenault's affiliation with a venture capital firm and Zuckerberg's status as a Silicon Valley superstar and mega-billionaire. "It is not enough, however, for a plaintiff simply to argue in the abstract that a particular director has a conflict of interest because she is affiliated with a particular type of institution." *Chen v. Howard-Anderson*, 87 A.3d 648, 671 (Del. Ch. 2014). There must be specific allegations that would support a reason to doubt that the director could exercise independent judgment on the issue presented. *See Beam*, 845 A.2d at 1048 (explaining that the court cannot infer that a director lacks independence "[w]ithout details about the nature of the contact").

The plaintiff has not called into question Chenault's independence. Whether viewed individually or together, the allegations against Chenault are insufficient to suggest that he could not exercise disinterested and independent judgment regarding a demand.

### 3. Hastings

The complaint fails to plead facts supporting a reason to doubt that Hastings could exercise disinterested and independent judgment regarding a demand. The plaintiff argues

50

that Hastings is not independent of Zuckerberg. The plaintiff also argues that Hastings faces a substantial likelihood of liability because he approved the Reclassification.

The complaint fails to allege facts supporting a reasonable inference that Hastings is beholden to Zuckerberg. Hastings is a cofounder of Netflix, serves as its CEO, and chairs its board of directors. The complaint alleges that "Netflix purchased advertisements from Facebook at relevant times." Compl. ¶ 99. Netflix also allegedly maintains "ongoing and potential future business relationships with" Facebook. *Id.* ¶ 100. The only specific facts that support this assertion allege that in March 2013, Netflix launched a "Friends and Community" initiative, which allows Facebook users to share data about their Netflix viewing habits with their Facebook friends. *Id.* The complaint also alleges that according to an article published by *The New York Times*, Facebook gave to Netflix and several other technology companies "more intrusive access to users' personal data than it ha[d] disclosed, effectively exempting those business partners from its usual privacy rules." *Id.* The exemption allowed Netflix and other favored companies to "read, write and delete users' private messages, and to see all participants on a thread." *Id.*

The complaint contends that "Hastings would not jeopardize this valuable relationship with Facebook and Zuckerberg by investigating or initiating the claims" because that "could prompt termination of the 'Friends and Community' data sharing or other current and future ventures." *Id.* The complaint's allegations support the existence of an ongoing, collaborative relationship between the two companies. They do not support an inference that the relationship is so important to Netflix as to compromise Hastings' independence. The complaint does not allege any specific facts about the extent to which

51

Netflix relies on the Facebook relationship as part of its business model or how valuable this relationship is to Netflix. The complaint does not identify any facts about the "Friends and Community" feature, such as how many Facebook users take advantage of this feature, or whether Netflix has realized any concrete advantages through this feature. The complaint's allegations thus do not support an inference that the relationship is sufficiently material to Netflix that it would compromise Hastings' ability to consider a demand.

The complaint also contends that "Hastings (as a Netflix founder) is biased in favor of founders maintaining control of their companies." *Id.* ¶ 99. This allegation does not identify an interest of a bias-producing nature. A director could believe in good faith that it is generally optimal for companies to be controlled by their founders and that this governance structure is value-maximizing for the corporation and its stockholders over the long-term. Others might differ. As long as an otherwise independent and disinterested director has a rational basis for her belief, that director is entitled (indeed obligated) to make decisions in good faith based on what she subjectively believes will maximize the long-term value of the corporation for the ultimate benefit of its residual claimants. *See generally The Frederick Hsu Living Trust v. ODN Hldg. Corp.*, 2017 WL 1437308, *16–22 (Del. Ch. Apr. 14, 2017). If a director believes that it will be better for the corporation to have the founder remain in control, then the director may make decisions to achieve that goal. As long as a director acts in good faith, exercises due care, and does not otherwise have any compromising interests, a director will not face liability for making a decision that she believes will maximize the long-term value of the corporation for the ultimate benefit of its residual claimants, even if a court later determines that the transaction was

52

not entirely fair. Even if Hastings believed that maintaining Zuckerberg's control over Facebook was desirable, that belief would not produce a conflict of interest that would render him incapable of considering a demand.

The complaint also alleges that Hastings, like Zuckerberg, has a track record of supporting philanthropic causes and has publicly endorsed founders of large companies making substantial donations during their lifetimes. Compl. ¶ 99. Hastings and Zuckerberg each have made large contributions to the Silicon Valley Community Foundation, which solicits donations from company founders and manages donor funds for both Hastings and Zuckerberg. *Id.* There is no logical reason to think that a shared interest in philanthropy would undercut Hastings' independence. Nor is it apparent how donating to the same charitable fund would result in Hastings feeling obligated to serve Zuckerberg's interests.

The plaintiff additionally argues that Hastings faces a substantial likelihood of liability because he voted in favor of the Reclassification. This court has assumed that the Reclassification would be reviewed for entire fairness and that there is a substantial likelihood that the court would conclude after trial that it was not entirely fair to Facebook's non-controlling stockholders. But it does not follow from those assumptions that Hastings faces a substantial likelihood of liability.

Facebook's certificate of incorporation contains a provision that exculpates directors to the fullest extent permitted by Delaware law. Consequently, to establish that Hastings faces a substantial likelihood of liability in connection with the Reclassification, the complaint must plead facts supporting a reasonable inference that Hastings either harbored self-interest adverse to the stockholders' interest, acted to advance the self-

53

interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith. *Cornerstone*, 115 A.3d at 1179–80.

The complaint does not plead any facts that would support a pleading-stage inference that Hastings committed a non-exculpated breach of fiduciary duty and thus could face personal liability as a result of voting to approve the Reclassification. Referring to all six director defendants collectively, the complaint states, "They each face a substantial likelihood of liability for their individual misconduct." Compl. ¶ 73. It then states that each director defendant "owed [Facebook] fiduciary duties of good faith, due diligence, and reasonable inquiry" and "knew of their own unlawful acts, participated in the actions of their colleagues, and failed to prevent these breaches of loyalty and due care." *Id.* ¶ 74. Nowhere does the complaint describe any "individual conduct" on Hastings' part. The complaint does not contain any suggestion that Hastings was aware of the improper back-channel communications between Andreessen and Zuckerberg. The allegations against Hastings are conclusory and do not support a reasonable inference that he faces a substantial risk of liability.

In briefing and at argument, the plaintiff maintained that the Reclassification was so obviously unsound that the Board never should have considered it, much less approved it and defended it until the eve of trial. Doubtless there are proposals that are so extreme or bizarre that independent directors should reject them summarily. Generally speaking, however, directors have an obligation to respond to potential corporate actions on an informed basis and after due deliberation. *See, e.g.*, *Technicolor*, 634 A.2d at 367 ("[D]irectors 'have a duty to inform themselves, prior to making a business decision, of all

material information reasonably available to them. Having become so informed, they must *then* act with requisite care in the discharge of their duties.'" (emphasis in original) (quoting *Aronson*, 473 A.2d at 812)). The Reclassification was not so outlandish as to warrant rejecting it out of hand. To the contrary, Google recently had implemented a similar transaction after a settlement that this court approved.

The plaintiff further argues that the process leading to the Board's approval of the Reclassification Plan was a sham marked by glaring problems and resulted in a transaction that did not extract any material concessions from Zuckerberg. The plaintiff disagrees with how the Committee proceeded, but those disagreements are not sufficient to support an inference of bad faith. "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *McElrath* v. *Kalanick*, 2019 WL 1430210, at *10 (Del. Ch. Apr. 1, 2019) (internal quotation marks omitted).

Finally, the plaintiff tries to bolster its argument by pointing to the Board's decision to withdraw the Reclassification. It is not inherently suspect to decide to moot a case, whether due to changed business circumstances or to enable the company to avoid the burden of a public trial.

When evaluating Hastings' decision to approve the Reclassification, it is important to consider those allegations collectively and not in isolation. Even viewed collectively, it is not reasonable to infer that the Reclassification was so extreme as to support an inference that Hastings approved it in bad faith. Nor is it reasonable to think that Hastings would be held liable after trial.

55

The complaint's allegations do not support a reasonable inference that Hastings is beholden to Zuckerberg. They do not support a reasonable inference that Hastings faces a substantial likelihood of liability on the claims that are the subject of the demand. Demand is not excused as to Hastings.

### 4. Thiel

The complaint fails to plead facts supporting a reason to doubt that Thiel could exercise disinterested and independent judgment regarding a demand. Like Hastings, Thiel voted in favor of the Reclassification. As with Hastings, the plaintiff maintains that Thiel faces a substantial threat of liability on the claims that would be the subject of a demand. As with Hastings, the plaintiff alleges that Thiel is not independent of Zuckerberg.

The complaint's allegations that Thiel faces a substantial likelihood of liability based on his decision to approve the Reclassification fall short for the same reasons as the allegations against Hastings. The complaint does not advance any incremental allegations against Thiel, so this decision will not repeat that analysis.

The complaint also fails to allege facts that provide reason to doubt whether Thiel is independent of Zuckerberg. The complaint alleges that Thiel was one of the early investors in Facebook and has served on the Board for longer than any of the other directors, with the exception of Zuckerberg. According to the complaint, Thiel has been "instrumental to Facebook's business strategy and direction over the years." Compl. ¶ 93. The complaint does not explain how Thiel's longstanding affiliation with Facebook or his instrumental contributions to Facebook translate into Thiel being beholden to Zuckerberg.

56

The complaint attempts to bolster its allegations with a variant of the argument about founder bias that the plaintiff leveled against Hastings. Thiel is a cofounder of PayPal, Inc., and he has been a partner at a venture capital firm called "Founders Fund" since 2005. The complaint alleges that the Founders Fund "strives to keep founders in long-term control of the companies they have created" and "touts Facebook as a primary example of that maxim, stating that 'we have often tried to ensure that founders can continue to run their businesses through voting control mechanisms, as Peter Thiel did with Mark Zuckerberg and Facebook.'" *Id.* As with Hastings, assuming that Thiel honestly believes that founder ownership benefits corporations and their stockholders over the long term, that belief is not a disqualifying interest. To support a contention that Thiel acted disloyally or in bad faith, the complaint would have to allege that Thiel believed that preserving founder ownership was harmful to Facebook, and that he nevertheless supported the Reclassification out of personal loyalty to Zuckerberg. As long as Thiel acted based on a sincerely and rationally held belief that his actions would benefit Facebook, his bias in favor of founders maintaining control is not disqualifying. The belief that founder control benefits corporations and their stockholders over the long run is debatable, but it is not irrational.

Harkening back to the allegations against Chenault, the complaint alleges that Thiel is beholden to Zuckerberg because the "Founders Fund gets 'good deal flow' from [its] high-profile association" with Facebook. *Id.* ¶ 94. As with Chenault, the complaint does not provide any specifics. It does not identify a single deal that has flowed to the Founders Fund as a result of Thiel's relationship with Facebook, still less that any such deal was material to Thiel or the Founders Fund.

The complaint similarly alleges that Thiel lacks independence because he has a "personal and financial interest in remaining on Facebook's Board." *Id.* ¶ 95. The complaint states that Facebook shares owned by the Founders Fund "will be released from escrow in connection with the Oculus VR acquisition" and that "Thiel stands to gain substantially from the vesting of stock in connection therewith." *Id.* The complaint fails to quantify those gains or explain why Thiel must retain his position on the Board to realize those gains.

Finally, the complaint attempts to suggest that Thiel must be indebted to Zuckerberg for allowing Thiel to continue serving on the Board despite a barrage of public criticism that Thiel has suffered. The complaint notes that Thiel played a major role in the Cambridge Analytica scandal and secretly financed lawsuits aimed at bankrupting a news website. *Id.* ¶¶ 96–97. The complaint also alleges that there were "widespread calls for Zuckerberg to remove Thiel from Facebook's Board . . . ." *Id.* ¶ 97. The complaint implies that Zuckerberg stood by Thiel, so it is reasonable to infer that Thiel feels a sense of obligation to Zuckerberg.

These allegations could support a reasonable inference that Thiel is beholden to Zuckerberg only if serving on the Board was material to Thiel. The complaint describes Thiel as a co-founder of PayPal and partner in a venture capital fund. These allegations support a reasonable inference that Thiel inhabits the rarified realms of the *uber*-rich and belongs to the Silicon Valley aristocracy. The complaint does not support an inference that Thiel's service on the Board is financially material to him. Nor does the complaint

58

sufficiently allege that serving as a Facebook director confers such cachet that Thiel's independence is compromised.

When evaluating the Thiel's relationship with Zuckerberg, it is important to consider these allegations holistically. Even viewed in that light, it is not possible to infer that the Thiel is beholden to Zuckerberg.

### 5. Bowles

The complaint fails to plead facts supporting a reason to doubt that Bowles could exercise disinterested and independent judgment regarding a demand. The complaint does not adequately allege that Bowles received a material personal benefit from the Reclassification or lacked independence from someone who did. The complaint also does not provide a basis to infer that Bowles faces a substantial likelihood of liability based on his involvement in the decision to approve the Reclassification.

The complaint attempts to establish that Bowles received a material personal benefit from the Reclassification by linking him to the financial advisors who worked for Facebook and the Committee. The complaint alleges "Morgan Stanley—a company for which [Bowles] also served as a longstanding board member at the time (2005-2017)—directly benefitted by receiving over $2 million in fees for its work on behalf of [Facebook] in connection with the Reclassification . . . ." Compl. ¶ 92. The complaint similarly alleges that Bowles had a "direct personal interest in the [R]eclassification" because he "ensured that Evercore and his close friend Altman financially benefitted from the [Committee's] engagement without requisite vetting or consideration . . . ." *Id.* These allegations do not support a reasonable inference that Bowles received any material personal benefit,

59

financial or otherwise, either from Facebook's retention of Morgan Stanley or the Committee's retention of Evercore.

The complaint next attempts to establish that Bowles was beholden to Zuckerberg. The complaint's allegations do not support that inference. The complaint alleges that Zuckerberg spoke with Bowles about taking the Giving Pledge and accelerating his charitable giving. It also alleges that after Zuckerberg made the announcement, Bowles told Zuckerberg that he was "proud to be a small part of [Zuckerberg's] life." *Id.* ¶ 40. These allegations suggest that Zuckerberg and Bowles had a collegial relationship, which is not sufficient to compromise Bowles' independence.

The complaint adds that "Bowles is beholden to the entire Board for granting a waiver of the mandatory retirement age for directors . . . so that [he] could stand for reelection despite having reached" that age. *Id.* ¶ 91. The complaint notes that under Facebook's Corporate Governance Guidelines, "the Board may only permit waivers in 'exceptional circumstances.'" *Id.* ¶ 92. So be it, but this conclusory assertion does not explain why or in what way Bowles would be beholden to the Board or what that would entail. The complaint does not suggest that the waiver was conditioned on Bowles supporting any particular initiative or person. Nor does it allege that Bowles' directorship is sufficiently important to him that continuing to serve on the Board could be viewed as a material inducement that would render Bowles beholden to his fellow directors.

The complaint also attempts to portray Bowles as facing a substantial likelihood of liability for having approved the Reclassification. The complaint relies on Bowles' service on the Committee in addition to the allegations advanced against Hastings and Thiel. This

60

decision already has rejected the argument that the decision to approve the Reclassification was so extreme as to support a substantial likelihood of liability. The question is whether Bowles' service on the Committee changes that conclusion.

The complaint asserts the Committee "was not fully informed, did not negotiate at arm's-length, and never demanded anything meaningful from Zuckerberg." *Id.* ¶ 77. The complaint also asserts that the "Committee squandered the significant negotiating leverage Zuckerberg gave it" by publicly announcing his accelerated Giving Pledge before the Committee had recommended the Reclassification to the Board. *Id.* These allegations, at most, allege a breach of the duty of care. Bowles does not face any threat of liability for breaches of the duty of care because Facebook has an exculpatory provision in its charter, and these allegations do not support an inference of bad faith.

In an effort to build up to an inference of bad faith, the complaint criticizes the Committee's negotiations with Zuckerberg. The complaint does not plead particularized facts to suggest that the Committee extracted so little value from Zuckerberg that its members could be found to have acted in bad faith. The complaint notes that at one point, Andreessen told Zuckerberg that Bowles was worried about the provision in the Founder Agreement that authorized Zuckerberg to take a leave of absence for government service, but that allegation cuts in the opposite direction. The fact that Bowles voiced concerns suggests that he acted independently, not the opposite.

This decision has assumed that Andreesen's back-channel communications with Zuckerberg fatally undermined the Committee's deliberations, resulting in a transaction that was not negotiated at arm's-length. Those problems, however, cannot be attributed to

61

Bowles, and there is no basis to conclude that Bowles knew about what Andreessen and Zuckerberg were doing. To the contrary, the complaint alleges that "Zuckerberg and Andreessen's shenanigans won over Bowles." *Id.* ¶ 49. Based on this allegation, the complaint seemingly agrees that Bowles was oblivious. Under *Cornerstone*, Bowles would be entitled to a pleading-stage dismissal because the plaintiff has not pled facts supporting an inference that Bowles acted with *scienter*. For the same reason, the complaint does not support a reasonable inference that Bowles would face a substantial threat of liability.

As with the allegations against Hastings and Thiel, it is essential to consider the allegations against Bowles in their totality. Even viewed in that light, it is not reasonable to infer that the Bowles could be held liable in connection with the Reclassification or that he is not independent.

### 6.  Desmond-Hellmann

The last director is Desmond-Hellman. She did not receive a material personal benefit from the Reclassification. She also does not face a substantial likelihood of liability based on her service on the Committee because, as with Bowles, the complaint does not plead facts sufficient to overcome the protections of Section 102(b)(7). That said, whether Desmond-Hellman is independent of Zuckerberg presents a comparatively close call. Because this decision already has found that five of the Board's nine directors can consider a demand, it does not evaluate Desmond-Hellman's independence.

### III. CONCLUSION

A majority of the Demand Board is disinterested, independent, and capable of considering a demand. Demand thus is not excused, and the defendants' motion to dismiss under Rule 23.1 is granted.